[Cite as *State v. Williams*, 2013-Ohio-1181.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

## JOURNAL ENTRY AND OPINION
## No. 98528

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# TERRANCE WILLIAMS

DEFENDANT-APPELLANT

## JUDGMENT:
### AFFIRMED IN PART; REVERSED IN PART;
### REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-543577

**BEFORE:** Rocco, J., Boyle, P.J., and Jones J.

**RELEASED AND JOURNALIZED:** March 28, 2013

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
Leader Building, Suite 940
526 Superior Avenue
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By:   Brent C. Kirvel
Assistant County Prosecutor
9th Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

KENNETH A. ROCCO, J.:

{¶1} Defendant-appellant Terrance Williams ("Williams") appeals from his convictions and sentence for two counts of aggravated murder, kidnapping, discharging a firearm on or near a prohibited premises, carrying a concealed weapon, and having weapons while under a disability. The trial court sentenced Williams to 33 years to life in prison with a mandatory period of 5 years postrelease control. The trial court's judgment is affirmed in part, reversed in part, and remanded for a limited resentencing hearing as set forth in this opinion.

{¶2} The victim in this case was Artimis Darden ("Darden"). At Williams's trial, several witnesses testified to the events that led to Darden's death on October 22, 2010. These witnesses all testified that Darden was at a house with friends on Donald Avenue ("the house") in Cleveland, Ohio on the night in question.

*Darden is Killed*

{¶3} Garrick Dalton ("Garrick") testified that he and Williams met up with Joey Sailes ("Sailes") at the house to shoot dice. Garrick testified that Williams was angry because he believed that Darden was the person who had earlier broken Williams's truck window. According to Garrick, Williams took Darden outside through the front door of the house. Garrick testified that Garrick went to the rear of the house and that he heard gunshots. Garrick then went to the front of the house where he saw Williams drag Darden to the driveway and shoot Darden in the head. At trial, the jury heard that

Garrick was also charged with aggravated murder, aggravated robbery, and kidnapping in conjunction with this case. Garrick testified that he was not offered a deal in exchange for his testimony.

{¶4} Crishawn Martin ("Crishawn") testified that he saw Williams enter the house with Garrick and another person. Crishawn observed that Williams had a gun in his pocket. Crishawn testified that Williams grabbed Darden by the shirt and forced him outside at gunpoint. According to Crishawn, Darden tried to run, and then Williams fired his gun at Darden. Darden fell in the street, Williams dragged Darden over to the sidewalk, and then he fired another shot at Darden.

{¶5} Christopher Martin ("Christopher") was also at the house that night. He was upstairs when he heard loud noises downstairs. He went into the closet to hide when he heard gunshots. After the shooting stopped, Christopher went over to the window and saw Williams standing over Darden.

{¶6} Dominick Bell ("Bell"), Quanesha Sullivan ("Sullivan"), and Charlotte Cabeza ("Cabeza") all testified that they saw Williams take Darden outside of the house, that Darden tried to run, and that they saw Williams shoot Darden.

{¶7} Antonio Wiggins ("Wiggins") testified at the trial and had earlier submitted a written statement that was also admitted into evidence. Wiggins testified that he went downtown with some detectives after Darden was shot. Wiggins viewed photo arrays at the homicide unit and identified Williams as the person who shot Darden. In his written statement, Wiggins also stated that Williams had a gun out when he entered the house and

that Williams was asking who Darden was. The written statement set forth that Williams grabbed Darden by the shirt and led him outside. Wiggins wrote that Darden tried to escape Williams's grasp and that is when Williams shot Darden.

{¶8} Johnny Darden ("Johnny") was Darden's cousin. He testified that he was sitting in his car outside of the house when the commotion began. Johnny got out of his car to see Williams holding Darden at gunpoint. When Darden tried to get away, Williams shot Darden. Johnny testified that he ran over to Darden. Johnny saw someone else run up with a gun, who then grabbed two more guns before running to the backyard.

*Williams is Shot and Pulled Over by Police*

{¶9} Crishawn, Christopher, Sullivan, Garrick, and Cabeza all testified that after they observed Williams standing over Darden, another shot rang out and Williams fell to the ground. Williams was helped into Sailes's SUV, but the two were pulled over by the police. Sailes testified that he was transporting Williams to Huron Road Hospital ("the hospital") when he was pulled over.

{¶10} Officer Maxel of the Cleveland Police testified that he pulled over a black Lexus SUV on the night in question, that two people were inside the SUV, and that one of them had been shot. Muzongo Kennedy ("Kennedy"), a paramedic for the Cleveland E.M.S., testified that he responded to a gunshot victim that night, that Williams was the gunshot victim, and that Williams told Kennedy that he was shot by an unknown person in an SUV.

*At the Hospital*

**{¶11}** Williams was taken to the hospital. Kellie Selig ("Selig") testified that on the night in question she worked at the hospital in the emergency room and that she treated Williams for a gunshot wound.

**{¶12}** Det. Ansari, of the Cleveland Police Department, testified that he was on his way to respond to a gunshot victim dead on arrival at the house when he received a call from the homicide unit indicating that there was another gunshot victim at the hospital and that he should respond there first. Det. Ansari testified that he met with Williams and two officers at the hospital. Det. Ansari stated that when he first spoke with Williams he was not aware that Williams was a suspect in the Darden murder, but that he did have information that Williams was the second person shot at the house.

**{¶13}** Williams told Det. Ansari that Williams was walking down Donald Avenue when he came upon a group of young men. Words were exchanged, and the next thing Williams knew, he was on the ground, with his friend Sailes trying to wake him up. Det. Ansari testified that Williams said that he did not have a vehicle and that he did not say how he arrived on Donald Avenue.

**{¶14}** Det. Ansari then spoke to Latonia Hollins ("Hollins"), who identified herself as Williams's fiancée. After speaking with Hollins, Det. Ansari asked Williams if he had the keys to Hollins's car, which Williams had in his jacket pocket. Det. Ansari then advised the officers at the murder scene to look for the car. The officers located the car, near the house. At this point, Det. Ansari advised Williams that he was under arrest.

*Physical Evidence*

{¶15}  Dr. Joseph Felo, a forensic pathologist with the Cuyahoga County Medical Examiner's Office, testified that he performed Darden's autopsy and that Darden suffered two fatal gunshot wounds, one through the chest and one through the head.   Darden had also sustained scattered blunt-type trauma on various parts of his body, including his head, arms, and legs.   He ruled Darden's death a homicide.   Patrolman McCandless, of the Cleveland Police Department, testified that during the investigation he recovered two handguns in the grass in the backyard of the house.

### The Cobra

{¶16} James Raynard ("Raynard"), a crime scene technician with the Cleveland Police Department, photographed a handgun recovered from the scene, a Cobra .380 Auto ("the Cobra").   He also photographed .380 caliber shell casings found on the ground. Det. Kooser, a firearms examiner for the Cleveland Police Department, testified as a ballistics expert and stated that the Cobra did not fire the .380 shell casings recovered from the scene.   Det. Kooser also testified that there were three .22 caliber long rifle rounds found at the scene, all fired from the same weapon.   That weapon was not recovered.

{¶17} Curtiss Jones ("Jones"), supervisor for the Trace Evidence Department at the Cuyahoga County Medical Examiner's Office, testified as an expert and stated that someone who shoots a firearm will not necessarily test positive for gunshot residue.   A residue test was conducted on Williams, and no gunshot residue was found.   Gunshot

residue was found on Darden. According to Jones, this indicated that Darden either fired a weapon or was in close proximity to a weapon that was fired.

<u>The Glock</u>

**{¶18}** Raynard also photographed a Glock Model 21.45 Auto ("the Glock") that was recovered from the scene. Raynard stated that the three .45 Auto shell casings found on the scene and the remaining bullets in the magazine of the Glock were the same brand of bullet, RP. Det. Kooser testified that the Glock matched the three .45 shell casings recovered from the scene.

**{¶19}** Carey Baucher ("Baucher"), a DNA analyst with the Cuyahoga County Regional Forensics Science Laboratory, conducted DNA analysis on the Glock. Testifying as an expert, Baucher stated that for Williams's known DNA profile, there were consistencies in the mixture all the way across the regions of interest. Baucher stated that Williams could not be excluded as being the owner of the DNA profile to the extent that only one in five million members of the African American population would be a match to the specific DNA mixture on the Glock.

**{¶20}** Williams also could not be excluded as a contributor to the DNA recovered from the Glock's magazine. The statistical odds of another member of the African American population being a match to the DNA mixture on the Glock's magazine was 1 in 180,200. Baucher also testified that Darden, Sailes, Garrick, and Johnny were all excluded as being contributors to the Glock's grip, trigger, and magazine.

**{¶21}** According to Baucher, the DNA profile taken from the right sleeve cuff of Williams's jacket was a match to Darden. Baucher stated that Darden's DNA profile was also a match to the sample taken from the front toe area of Williams's right boot.

*The Verdict and Sentence*

**{¶22}** At the trial's conclusion, Williams was found guilty of two counts of aggravated murder, with one and three-year gun specifications; kidnapping, with one and three-year gun specifications; discharging a firearm on or near a prohibited premises, with one and three-year gun specifications; carrying a concealed weapon; and having weapons while under a disability. The trial court sentenced Williams to 33 years to life in prison with a mandatory period of 5 years postrelease control. Williams filed his notice of appeal from the trial court's entry of final judgment and presents four assignments of error for review.

> I. The trial court erred in denying Williams' motion for acquittal because the state failed to present sufficient evidence to convict Williams.
>
> II. Williams' convictions were against the manifest weight of the evidence.
>
> III. Williams was denied effective assistance of counsel, because defense counsel did not file a motion to suppress and did not request a hearing regarding statements made by Williams.
>
> IV. The trial court erred by ordering convictions and a sentence for separate counts of aggravated murder, because the offenses are allied offenses under R.C. 2941.25 and are part of the same transaction under R.C. 2929.14.

For the reasons that follow, we find no merit to the first three assignments of error, but we sustain the fourth assignment of error.

{¶23} In his first assignment of error, Williams argues that the state's evidence was insufficient to sustain his conviction. We disagree. When a defendant makes a motion under Crim.R. 29(A), the trial court shall enter a judgment of acquittal if the evidence is insufficient to sustain a conviction for the offense. When we review on appeal whether the verdict was supported by sufficient evidence, our task is to determine whether "'after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶24} Williams was convicted on two counts of aggravated murder under R.C. 2903.01(A) and 2903.01(B). Under R.C. 2903.01(A), "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." Accordingly, to find Williams guilty of murder under this provision, the factfinder would have to conclude that Williams purposely, and with prior calculation and design, caused the death of Darden. A person acts "purposely when it is his specific intention to cause a certain result * * *." R.C. 2901.22(A). "Prior calculation and design" is "indicate[d] [by] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997). While, "[n]either the degree of care nor the length of time * * * are critical factors in themselves, * * * they must amount to more than

momentary deliberation." *Id.* "[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design." *State v. Hough*, 8th Dist. No. 91691, 2010-Ohio-2770, ¶ 19.

{¶25} Under R.C. 2903.01(B), "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit * * * kidnapping * * *." Kidnapping is a violation of R.C. 2905.01(A)(3), which provides that "[n]o person, by force [or] threat * * * shall remove another from the place where the other person is found * * *" with the purpose "[t]o terrorize, or to inflict serious physical harm on the victim." Accordingly, to find Williams guilty of murder under R.C. 2903.01(B), the factfinder would have to conclude that Darden died as a proximate result of Williams's forcefully removing Darden from one place to another, with the purpose of causing Darden serious harm.

{¶26} In support of his position that the evidence against him was insufficient to sustain a conviction, Williams first appears to argue that because Williams, himself, was shot that night, and because that shooter was never found, that this somehow negates all of the evidence that was presented to prove that Williams shot Darden. Williams does not explain why his being shot would undermine the evidence against him. Simply put, this argument is wholly without merit.

{¶27} Williams next argues that the witnesses constantly wavered in their testimony, that no gunshot residue was linked to Williams, and that there was no fingerprint, DNA, or any other physical evidence linking him to the crimes. We easily

conclude that any rational trier of fact could have found that the essential elements of aggravated murder were proven beyond a reasonable doubt. When reviewing a verdict for sufficiency of the evidence, we do not consider credibility. Rather, we "examine the evidence admitted at trial to determine whether such evidence, *if believed*, would convince the average mind of the defendant's guilt beyond a reasonable doubt." (Emphasis added.) *Jenks*, 61 Ohio St.3d at 273, 574 N.E.2d 492. *See also State v. Abu-Enjeela*, 7th Dist. No. 11 MA 102, 2012-Ohio-6275, ¶ 20 ("A review of a Crim.R. 29(A) motion is not a review of credibility, but a review of sufficiency * * *."). Even if credibility was relevant in reviewing sufficiency of the evidence, we note that several eye witnesses testified that they saw Williams remove Darden from the house at gunpoint, drag Darden to the driveway, shoot Darden, and then stand over Darden shooting him a second time. Evidence was also presented that Williams had a gun out when he entered the house and that he was asking about Darden.

{¶28} Further, Williams is incorrect in arguing that there was no DNA or physical evidence linking him to the murder. Baucher testified that Darden's DNA was found on Williams's jacket and shoe. This physical evidence is consistent with the testimony from numerous witnesses, that Williams grabbed Darden and that Williams later stood over Darden, shooting him as he lay on the ground. DNA evidence also linked Williams to the Glock recovered at the scene.

{¶29} Having viewed the evidence presented at trial in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential

elements of R.C. 2903.01(A) and (B) proven beyond a reasonable doubt. The testimony and physical evidence were sufficient to establish that Williams purposely and with prior calculation and design caused Darden's death. The evidence was also sufficient to establish that Darden was killed as the proximate result of Williams kidnapping Darden. Accordingly, we overrule the first assignment of error.[1]

{¶30} In his second assignment of error, Williams argues that his convictions were against the manifest weight of the evidence. Not so. In evaluating whether a conviction is against the manifest weight of the evidence, this court sits as the thirteenth juror. We review the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether the jury clearly lost its way such that there was a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We grant a new trial only in the exceptional case where the evidence weighs heavily against the conviction. *Id.*

{¶31} In support of his argument that his convictions were against the manifest weight of the evidence, Williams argues that the witnesses' testimony does not "add up," because they were not credible. Specifically, Williams questions the credibility of Garrick, Cabeza, Christopher, and Johnny. Although we consider the witnesses' credibility in reviewing whether a verdict is against the manifest weight of the evidence,

---

[1]Although there was sufficient evidence to sustain convictions against Williams for both counts of aggravated murder under R.C. 2903.01(A) and (B), the offenses should have merged because they were allied offenses. As we discuss under the fourth assignment of error, the trial court erred in failing to merge the convictions.

we also recognize that the factfinder is in the best position to weigh the witnesses' credibility. *See State v. Johnson*, 8th Dist. No. 97698, 2012-Ohio-3812, ¶ 24 (determining that the factfinder was in the best position to weigh the witness' credibility, and that any inconsistencies in the witness' testimony were not of the sort that would constitute a manifest miscarriage of justice).

{¶32} Williams argues that some of the witnesses presented conflicting testimony and were unreliable. Specifically, Williams points out that Garrick was also charged with aggravated murder, aggravated robbery, and kidnapping in conjunction with this case. Williams also questions Garrick's credibility because Garrick had reviewed some of the discovery prior to testifying at trial. The transcript also revealed that Garrick's testimony contained some conflicts with an earlier statement that Garrick had signed.

{¶33} Williams makes a similar argument with regard to a conflict between Cabeza's testimony and an earlier statement she had made to law enforcement. In addition, Williams points out that Cabeza had been drinking and smoking marijuana on the night in question. Williams also asserts that because, on an unrelated, earlier occasion, Crishawn and Christopher's cousin broke Cabeza's jaw, that she was somehow intimidated into offering her testimony at Williams's trial.

{¶34} Williams argues that Christopher's[2] testimony is also inconsistent, but the basis for this allegation is unclear. Finally, Williams alleges that Johnny identified

---

[2]Williams's brief refers to Crishawn's testimony, but it is clear from his argument that he is referring to Christopher's testimony. Williams's argument involves the fact that the witness was hiding in the closet. Christopher, not Crishawn, was hiding in the closet.

Williams's defense counsel as the shooter, but the transcript does not confirm this allegation.

{¶35} Having reviewed the testimony of each of these witnesses, we do not find anything that would lead us to conclude that Williams's convictions constituted a miscarriage of justice. The witnesses were subjected to cross- examination. The jury was able to hear from both sides and was able to make a determination as to whether a particular witness was credible. Furthermore, there were other witnesses besides Garrick, Cabeza, Christopher, and Johnny who also testified to seeing Williams shoot Darden.

{¶36} Williams also argues that his convictions were against the manifest weight of the evidence because gunshot residue was not found on Williams's hands or jacket. But the jury heard expert testimony that someone who shoots a firearm will not necessarily test positive for gunshot residue. In addition, there was other physical evidence that supported the version of events to which the witnesses testified. Darden's DNA was found on Williams's jacket and shoe, which is consistent with the testimony that Williams had grabbed Darden and that Williams stood over Darden when he shot him the second time. The witness testimony and physical evidence supported a finding of guilt, and the jury did not lose its way in rendering a guilty verdict. Williams's conviction was not against the manifest weight of the evidence, and so we overrule the second assignment of error.

{¶37} In his third assignment of error, Williams asserts that his trial counsel was ineffective for not filing a motion to suppress and for failing to request a suppression hearing with respect to certain statements that Williams made at the hospital to Det. Ansari. We disagree.

{¶38} A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To determine whether a defendant received ineffective assistance of counsel, we first evaluate whether counsel's performance was deficient, meaning errors were so serious that counsel was not functioning as "counsel" guaranteed to the defendant under the Sixth Amendment. *Id.* at 687.

{¶39} If we determine that counsel's performance was deficient under the first prong, we must then determine whether the errors prejudiced the defendant such that the defendant was deprived of a fair and reliable trial. *Id.* We determine prejudice by analyzing whether "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "Reasonable probability" is defined as probability sufficient to undermine confidence in the outcome. *Id.* Trial counsel's failure to file a suppression motion does not constitute ineffective assistance of counsel under the *Strickland* test unless a review of the record indicates that the motion would have been granted. *State v. Smith*, 8th Dist. No. 90559, 2009-Ohio-737, ¶ 22.

{¶40} We need not decide whether a motion to suppress would have been granted, because even if Williams's statements to Det. Ansari had been suppressed, there was still ample evidence from which the factfinder could have determined that Williams was guilty. Several eye witnesses testified, in detail, that they saw Williams force Darden out of the house at gunpoint, that Williams shot Darden, and then Williams stood over Darden and shot him again. Therefore, assuming arguendo that Williams's counsel was deficient in not filing a motion to suppress, there is not a reasonable probability that, but for this error, the result of the proceeding would have been different. Accordingly, Williams was not prejudiced, and so we overrule the third assignment of error.

{¶41} In his fourth assignment of error, Williams argues that the trial court erred in sentencing him on separate counts of aggravated murder, because the offenses were allied. When a defendant's conduct results in the commission of two or more "allied" offenses of similar import, that conduct can be charged separately, but the defendant can be convicted and sentenced for only one offense. R.C. 2941.25(A). In determining whether offenses merge, we consider the defendant's conduct. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 44. "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 50 (Lanzinger, J., dissenting). If we answer both questions affirmatively,

then the offenses are allied offenses of similar import and will be merged. *Johnson* at ¶ 50.

{¶42} In the instant case, with respect to the two counts of aggravated murder, the trial court ordered Williams to serve 30 years to life, with an additional 3 year consecutive sentence for the gun specification on each count. Regarding kidnapping and discharging a firearm on or near a prohibited premises, the trial court sentenced Williams to 11 years in prison with an additional 3 year consecutive sentence for the gun specification on each count. The trial court sentenced Williams to 18 months in prison for carrying a concealed weapon, and to 36 months in prison for having weapons while under a disability. All of the terms were to be served concurrently, for an aggregate sentence of 33 years to life in prison.

{¶43} Williams correctly asserts that the sentencing transcript contains no discussion about whether these offenses were allied or of similar import. On appeal, Williams argues that the two counts for aggravated murder were allied offenses and should have merged. The trial court stated on the record that it was sentencing Williams for both counts of aggravated murder. Therefore, if those two counts were subject to merger, the trial court erred in imposing the sentence on both counts of aggravated murder.

{¶44} Williams killed only one victim: Darden. Count One of the indictment charged Williams with aggravated murder under R.C. 2903.01(A). Count Two of the indictment charged Williams with aggravated murder under R.C. 2903.01(B). The

allegations giving rise to both counts involved Williams killing Darden. The jury found Williams guilty on both counts.

**{¶45}** Applying the *Johnson* test to the instant case, we conclude that the multiple aggravated murder counts involving the same victim were subject to merger. *See State v. Brenson*, 5th Dist. No. 09-CA-18, 2011-Ohio-1880, ¶ 11 (finding that multiple aggravated murder counts involving the same victim were subject to merger); *State v. Bickerstaff*, 7th Dist. No. 09 JE 33, 2011-Ohio-1345, ¶ 76 (trial court committed plain error by failing to merge convictions for murder and aggravated murder).

**{¶46}** Because the trial court did not merge the two counts of aggravated murder, we vacate only that portion of the sentence that pertains to the two counts of aggravated murder. We do not vacate the underlying conviction or any other portion of the sentence. On remand, the sentencing hearing is limited to correcting the aforementioned error. *See State v. Huber*, 8th Dist. No. 98206, 2012-Ohio-6139, ¶ 17 ("A sentencing hearing on remand is limited to the issue found to be in error on appeal.").

**{¶47}** The trial court's judgment is affirmed in part, reversed in part, and the case is remanded for a limited resentencing hearing as set forth in this opinion.

It is ordered that appellant and appellee share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to

Rule 27 of the Rules of Appellate Procedure.


_____
KENNETH A. ROCCO, JUDGE

MARY J. BOYLE, P.J., and
LARRY A. JONES, SR., J., CONCUR