[Cite as *State v. Washington*, 2019-Ohio-2215.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                      No. 107286

    v.                                  :

CHRISTIAN WASHINGTON,                    :

    Defendant-Appellant.        :

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 6, 2019

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-621403-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Gregory Ochocki and Callista Plemel, Assistant Prosecuting Attorneys, *for appellee.*

Thomas A. Rein, *for appellant.*

FRANK D. CELEBREZZE, JR., J.:

{¶ 1} Defendant-appellant, Christian Washington ("appellant"), brings the instant appeal challenging his convictions for aggravated burglary, kidnapping, domestic violence, endangering children, menacing by stalking, and disrupting public services. Specifically, appellant argues that his convictions were not

supported by sufficient evidence and against the manifest weight of the evidence. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} The instant appeal arose from eight separate incidents that occurred between appellant and Alicia Flowers (hereinafter "victim") between December 2016 and September 2017. Appellant and the victim met on July 5, 2016, and became intimate with one another approximately one week later. A month or so after meeting, their relationship "went bad." (Tr. 27.) Also, in late-August 2016, the victim learned that she was pregnant with appellant's child. The child was born in November 2016.

{¶ 3} The tumultuous relationship between appellant and the victim is well-documented. Between December 2016 and September 2017, the victim made approximately 20 calls to the Cleveland Metropolitan Housing Authority ("CMHA") Police Department involving appellant. (Tr. 29-30.) The specific details about the nature of these reports and the eight incidents for which appellant was charged will be discussed in further detail below.

{¶ 4} In Cuyahoga C.P. No. CR-17-621403-A, the Cuyahoga County Grand Jury returned an 27-count indictment on September 29, 2017, charging appellant with (1) attempted murder, (2) aggravated burglary, (3) kidnapping, (4) domestic violence with a furthermore specification alleging that appellant previously pled guilty to or was convicted of three domestic violence offenses (June 2007 in Summit County; October 2008 in Summit County; and October 2008 in Summit County),

(5) endangering children, (6) menacing by stalking with a furthermore specification alleging that appellant trespassed on the land or premises where the victim lives, works, or attends school, (7) menacing by stalking with a furthermore specification alleging that appellant made a threat of physical harm to or against the victim, (8) menacing by stalking with a furthermore specification alleging that appellant has a history of violence toward the victim or any other person or a history of other violent acts toward the victim or any other person, (9) burglary, (10) theft, and (11) robbery, (12) theft, (13) theft, (14) domestic violence with a furthermore specification alleging that appellant pled guilty to or was convicted of three previous domestic violence offenses, (15) endangering children, (16) theft, (17) burglary, (18) theft, (19) aggravated robbery with a one- and three-year firearm specification, (20) theft, (21) theft, (22) burglary, (23) criminal damaging or endangering, (24) aggravated burglary, (25) domestic violence with a furthermore specification alleging that appellant pled guilty to or was convicted of three previous domestic violence offenses, (26) kidnapping, and (27) disrupting public services. Appellant was arraigned on October 4, 2017. He pled not guilty to the indictment.

{¶ 5} Appellant waived his right to a jury trial and elected to try the case to the bench. A bench trial commenced on March 19, 2018. The victim testified about the ongoing discord between her and appellant and the eight incidents for which appellant was charged in the indictment. The victim's testimony will be addressed in chronological order.

{¶ 6} The victim testified, in general, that during several of the incidents, appellant would take her cell phone. Appellant would occasionally hit the victim, but he did not do so every time. The victim explained that appellant had a key to her apartment that he would occasionally use to gain entry. Other times, appellant would break into her apartment, either by kicking in the front door or entering through an upstairs window.

### A. December 1, 2016

{¶ 7} Counts 9 and 10 of the indictment pertained to this incident. The victim testified that appellant came into her house, kicked and knocked at the door, came inside, and took her cell phone. She did not invite him inside on this occasion, nor did he have her permission to be there.

### B. December 9, 2016

{¶ 8} Counts 11, 12, and 13 pertained to this incident, which occurred in a courtyard outside of the victim's unit. The victim testified that appellant grabbed her, took her wallet, and stole her food-stamp card. According to the victim, appellant had a gun at the time this incident occurred.

### C. April 16 and 17, 2017

{¶ 9} Counts 14, 15, and 16 of the indictment pertained to an incident that occurred on April 16, 2017. Counts 17 and 18 pertained to an incident that occurred on April 17, 2017.

{¶ 10} The victim testified that on April 16, 2017, she was at a friend's house when she got into an argument with appellant. She explained that during the

argument, appellant "spazzed out" and pushed her while she was holding their son, who was less than one-month old. The victim's friend was eventually able to kick appellant out of the house. The victim spent the night at her friend's house.

{¶ 11} The victim testified that she received a text message from appellant the following day, April 17, 2017, that contained "a picture of [her] house being empty." (Tr. 37.) The victim ran home with her friend and discovered appellant had taken several of her belongings. Specifically, appellant stole beds, tables, "end tables, the carpet, the TVs. [Her daughter's] TV, food, dishes, mop, broom, everything but the couch and my mirror and my washing machine and drier." (Tr. 37.) After discovering that appellant stole her belongings, the victim called the police and filed a report.

### D. June 9, 2017

{¶ 12} Counts 19, 20, and 21 of the indictment pertained to this incident. The victim testified that appellant was in possession of a gun and he "took something" from her. (Tr. 45.) The victim could not recall whether appellant took her cell phone or her food-stamp card, but she confirmed that appellant took something from her during this incident. The victim stated that appellant had a gun and pointed it at her. However, she subsequently explained that appellant "basically, like, showed [the gun] to me. * * * He showed it and let me know he had a gun, understanding that he had a gun and he's crazy." (Tr. 45.) The victim described the gun as a black .40 caliber Glock.

### E. August 17, 2017

{¶ 13} Counts 22 and 23 of the indictment pertained to this incident. The victim testified that appellant broke into her apartment and flipped the victim's couch upside down.

### F. August 21, 2017

{¶ 14} Counts 24-27 of the indictment pertained to this incident. The victim testified that appellant broke into her apartment by moving an air conditioning unit from an upstairs window. After entering the apartment, appellant "smashed everything" inside. Specifically, appellant "smashed" a television, Roku, and Fire Stick that belonged to her daughter.

{¶ 15} The victim further testified that appellant came to her apartment and would not let her leave or take her daughter to school. Appellant "smashed" her cell phone. Regarding her assertion that appellant would not let her leave the apartment, the victim explained: "[appellant] was intimidating. ['B***h], if you leave, I am going to [f**k] you up.['] He was threatening me. He was throwing stuff. He was acting real crazy." (Tr. 52.) At some point, appellant permitted the victim to take her daughter to the bus stop and the victim was able to contact the police. CMHA police assured the victim that appellant was going to jail because he purportedly came into her apartment despite being on CMHA's "banned list."

### G. September 2, 2017

{¶ 16} Counts 1-5 of the indictment pertained to this incident. The victim testified that she was awoken by appellant who broke into her apartment and began

choking her. She explained, "[appellant] tried to kill me. He choked me. He used both hands. I woke up and I couldn't breathe, it was crazy." (Tr. 55.) The victim testified that appellant "kicked [her] real hard" as he was leaving her apartment, he "flipped out," and proceeded to threaten the victim's neighbor and kick the neighbor's car as he was leaving. (Tr. 54-55.)

## H. December 1, 2016 to September 2, 2017

{¶ 17} Counts 6, 7, and 8 of the indictment pertained to this date range. The menacing by stalking offenses charged in these counts contained furthermore specifications alleging that (1) appellant trespassed on the land or premises where the victim lives, works, or attends school (Count 6); (2) appellant has a history of violence toward the victim or any other person or a history of other violent acts toward the victim or any other person (Count 7); and (3) appellant has a history of violence toward the victim or any other person or a history of other violent acts toward the victim or any other person (Count 8).

{¶ 18} At the close of the state's case, defense counsel moved for a Crim.R. 29 judgment of acquittal. The trial court granted the Crim.R. 29 motion as to Counts 1, 20-23, 25, and the firearm specifications underlying Count 19. The trial court denied the Crim.R. 29 motion as to Counts 2-11, 13-17, 24, 26, and 27. Finally, regarding Counts 12 and 18, the trial court modified the fifth-degree felony theft offenses charged in the indictment to first-degree misdemeanors.

{¶ 19} After the trial court ruled on defense counsel's Crim.R. 29 motion, the defense rested without calling any witnesses, and renewed the Crim.R. 29 motion. The trial court denied the renewed motion.

{¶ 20} The trial court returned its verdict on April 16, 2018. The trial court found appellant guilty on Counts 2, 3, 4, 5, 6, 7, 8, 13, 14, 15, 24, 26, and 27. The trial court found appellant not guilty on Counts 9, 10, 11, 12, 16, 17, 18, and 19. The trial court ordered a presentence investigation report and set the matter for sentencing.

{¶ 21} The trial court held a sentencing hearing on May 18, 2018. The trial court sentenced appellant to an aggregate prison term of four years.

{¶ 22} On June 9, 2018, appellant filed the instant appeal challenging the trial court's judgment. He assigns two errors for review:

> I. The trial court erred when it denied appellant's motion or acquittal, pursuant to Crim.R. 29(A), on the charges, and thereafter convicting appellant of those charges as the conviction was not supported by sufficient evidence.

> II. Appellant's conviction was against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 23} In his two assignments of error, appellant argues that his convictions for aggravated burglary, kidnapping, domestic violence, endangering children, menacing by stalking, and disrupting public services were not supported by sufficient evidence and against the manifest weight of the evidence.

## A. Sufficiency

{¶ 24} A careful review of appellant's assignments of error and the arguments he raises therein reflects that appellant's sufficiency and manifest weight challenges are based on the same arguments. Specifically, appellant challenges the victim's credibility and the credibility of her testimony. This argument pertains to the manifest weight of the evidence, rather than the sufficiency of the evidence. *See State v. Williams*, 8th Dist. Cuyahoga No. 98528, 2013-Ohio-1181, ¶ 27 (this court does not consider the credibility of the witnesses when reviewing a challenge to the sufficiency of the evidence); *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79.

> A Crim.R. 29 motion challenges the sufficiency of the evidence. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

*State v. Keller*, 8th Dist. Cuyahoga No. 106196, 2018-Ohio-4107, ¶ 19.

{¶ 25} In this appeal, appellant does not specifically present an argument as to why there was insufficient evidence to support his convictions. Appellant raises one argument that can arguably be construed as a challenge to the sufficiency of the

evidence and whether the state proved the essential elements of the offenses for which he was convicted beyond a reasonable doubt. Specifically, appellant summarily concludes, without any analysis of the elements or the evidence other than the victim's testimony, that "[t]here is insufficient evidence to sustain a conviction against [a]ppellant given the facts of this case." Appellant's brief at 14.

{¶ 26} A review of appellant's arguments reflects that he is challenging his convictions on manifest weight grounds.

> "A claim that a conviction is against the manifest weight of the evidence is qualitatively different from a claim that a conviction is not supported by sufficient evidence." *State v. Sparent*, 8th Dist. Cuyahoga No. 96710, 2012-Ohio-586, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. The failure to present a separate argument on each claim of an appeal is a violation of App.R. 16(A)(7); therefore, we disregard this assigned error so far as it concerns the sufficiency of the evidence. *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 2; S*parent* at ¶ 11. *State v. Brown*, 8th Dist. [Cuyahoga] No. 87932, 2007-Ohio-527, ¶ 13.

*Cleveland v. Hall*, 8th Dist. Cuyahoga No. 101820, 2015-Ohio-2698, ¶ 14.

{¶ 27} Based on the foregoing analysis, we disregard and overrule appellant's first assignment of error to the extent that it relates to the sufficiency of the evidence. *Hall* at *id.* We will, however, address the issues and arguments appellant raises in his first assignment of error that pertain to the manifest weight of the evidence.

## B. Manifest Weight

{¶ 28} In his second assignment of error, appellant argues that his convictions are against the manifest weight of the evidence.

{¶ 29} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, at ¶ 12. A reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 30} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No.

02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 31} In the instant matter, in support of his manifest weight challenge, appellant argues that neither the victim nor her trial testimony were credible. Specifically, appellant contends that (1) the victim admitted to trying to "set up" appellant and get him arrested, (2) the victim admitted to continuing to contact appellant via text message, (3) the victim is a convicted felon and had previously been convicted of making up a false alarm/allegation that her child had been abducted/kidnapped, (4) the victim swore in open court and, despite the fact that the profanities had been transcribed by the court reporter, denied doing so, (5) the victim refused to cooperate with police on several occasions, (6) CMHA officers testified that the victim is argumentative and uncooperative, and that it was typical to be dispatched to her house, and (7) the victim alleged that appellant broke in and stole her phone, and held her against her will, but when the officers arrived at her house, the victim was in possession of the phone. (Tr. 132.)

{¶ 32} After reviewing the record, for the reasons set forth below, we cannot conclude that the trial court, as the trier of fact, clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions must be reversed. Nor do we find that this is an "'exceptional case in which the evidence weighs heavily against the conviction[s].'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717.

{¶ 33} First, appellant argues that the victim admitted to trying to "set up" appellant and get him arrested, and that she continued to send text messages to appellant asking to see him.

{¶ 34} The victim did, in fact, acknowledge that she wanted — even planned — to get appellant arrested so she could return home and no longer have to move around with her children. Following the September 2, 2017 incident during which appellant choked and "tried to kill" the victim, CMHA police decided to move the victim to a safe location until they were able to apprehend appellant. The victim was moved to a hotel in North Olmsted, Ohio.

{¶ 35} The victim also acknowledged on cross-examination that she continued to text appellant after the incidents for which appellant was indicted. She explained that she wanted him to come to the hotel in North Olmsted so he would get arrested and she could return to her apartment. (Tr. 69.)

{¶ 36} Defense counsel confronted the victim with various text messages that were exchanged between appellant and the following phone number: (216) 236-1712. The victim disputed sending these text messages to appellant. One of the text messages with which the victim was confronted stated,

> Where you at baby daddy? You want to suck this p[***]y one last name. You know you love me. Laughing my a[**] off. Get off my line. B[***]h, you love the f[**]k out of me. Tell me you love me first and I might drop the charges. It's on you.

 (Tr. 68-69.) Other text messages stated that appellant was "going to be sorry" and that the victim "will drop the charges."

{¶ 37} As noted above, the victim disputed sending these text messages to appellant. She asserted that appellant sent the text messages to himself using a "call app," and that the phone number from which the texts were sent did not belong to her.

{¶ 38} CMHA Detective Ashley Jaycox testified that she was assigned to the case in August 2017 after officers noticed a pattern of officers being dispatched to the victim's address for calls involving the victim and appellant. Between December 2016 and September 2017, CMHA police responded to 16 calls at the victim's address, 11 of which resulted in a report being filed.

{¶ 39} During the course of her investigation, Detective Jaycox interviewed the victim and the victim provided her with the victim's three cell phone numbers. Detective Jaycox stated that she never personally received the (216) 236-1712 phone number from the victim. However, officers did become aware of this number during the investigation. (Tr. 152.) After appellant was arrested, he was interviewed and provided officers with the (216) 236-1712 phone number. Appellant showed Detective Jaycox this phone number on his phone and said that it was the victim's number. (Tr. 155.) Detective Jaycox reviewed the text messages exchanged between the (216) 236-1712 number, purportedly belonging to the victim, and appellant. The victim was apologetic to appellant in the messages.

{¶ 40} After hearing the victim's trial testimony in which she denied that the (216) 236-1712 number belonged to her, Detective Jaycox ran the number through "CP Clear" to determine who the number belonged to. The number traced back to a

"third-party company, an IP company called Neutral Tandem." (Tr. 157.) She confirmed the number did not belong to and/or was not registered to the victim.

{¶ 41} On cross-examination, Detective Jaycox acknowledged that text messages were exchanged between the (216) 236-1712 number and appellant two days after the September 2, 2017 incident during which appellant allegedly choked and tried to kill the victim. The text messages invited appellant to the hotel where the victim was staying to engage in sexual acts. (Tr. 161-162.) Furthermore, the text messages included naked pictures of the victim in the hotel room.

{¶ 42} On redirect examination, Detective Jaycox explained that appellant did not show her any text messages from the victim that were sent from other phone numbers. All of the text messages that were purportedly sent from the victim to appellant were sent from the (216) 236-1712 number that Detective Jaycox verified was not registered to the victim. (Tr. 174.)

{¶ 43} Second, in arguing that his convictions are against the manifest weight of the evidence, appellant relies heavily on the fact that the victim is a convicted felon and previously pled guilty to making a false kidnapping/abduction allegation involving her daughter as well as fifth-degree felony vandalism.

{¶ 44} As an initial matter,

> [s]imply because a witness has a criminal record does not mean his or her testimony cannot be relied upon to convict a defendant. *See, e.g., State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 44 [(8th Dist.)]; *see also State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 130 (credibility of witnesses in murder case was left to the jury where witnesses admitted they were high on crack cocaine the day of the murder and had "extensive criminal histories"); *State v. Medezma-*

*Palomo*, 8th Dist. Cuyahoga No. 88711, 2007-Ohio-5723, ¶ 36-37 (fact that several of the state's witnesses had criminal records did not preclude the jury from finding their testimony to be credible); *State v. Petty*, 10th Dist. Franklin Nos. 11AP-716 and 11AP-766, 2012-Ohio-2989, ¶ 41 (fact that witnesses had criminal records did not render their testimony unreliable; jury could weigh information regarding witnesses' criminal histories in determining how much credibility to give their testimony).

*State v. Robertson*, 8th Dist. Cuyahoga No. 106279, 2018-Ohio-2934, ¶ 29.

{¶ 45} Nevertheless, the victim testified about her criminal history, both on direct and cross-examination. She also explained the circumstances surrounding the false kidnapping/abduction allegation. Notwithstanding the victim's criminal history and her purported motive to "set up" appellant to get him arrested, there were aspects of her testimony that were supported by other evidence.

{¶ 46} The victim's testimony regarding the 2017 incidents during which appellant gained entry into her apartment through a window and "smashed everything" was supported by the testimony of CMHA Officer William Shelton. Officer Shelton testified that he responded to the victim's apartment on September 3, 2017, and observed an air conditioning unit pushed to the side. Officer Shelton asserted that the apartment looked like it had been ransacked. (Tr. 97.)

{¶ 47} The victim's testimony regarding the incident during which appellant choked her was supported by the photographs documenting the injuries she sustained during this altercation and Officer Shelton's testimony. Officer Shelton testified that one of the photographs was "a picture of [appellant's] nails into [the

victim's] neck or chin," and confirmed that blood can be observed in the photograph. (Tr. 98.)

{¶ 48} Third, regarding appellant's argument that the victim was uncooperative with CMHA police, the victim explained why she would become upset and angry during her encounters with CMHA authorities. She testified that she would become upset based on (1) the numerous occasions on which she would have to call the police regarding appellant, (2) the fact that appellant broke into her apartment several times, (3) the fact that it would take CMHA officers 15-20 minutes to respond to her apartment, and (4) the fact that appellant would simply leave her apartment during the 15-20 minute time period it took officers to respond, and return after the officers left. (Tr. 93.) The victim asserted that she cooperated with the police every time they came out to her house and responded to her calls.

{¶ 49} CMHA Police Officer Christopher Svec testified that he responded to the victim's unit on December 9, 2016, and upon arrival, the victim was hysterical, very upset, yelling, screaming, crying, and afraid. (Tr. 113.) On cross-examination, in response to defense counsel's suggestion that the victim was uncooperative, he explained, "[d]ue to being, you know, robbed and accosted and everything else, she was very upset and irate." (Tr. 115.) He further explained that the victim was "upset, irate from the incident that had occurred. She was in fear and everything else." (Tr. 116.) However, after he was able to calm the victim down, she was "all right" and he was able to speak with her, find out what happened, and obtain a statement from

her. Detective Jaycox testified that despite the victim's demeanor and her tendency to get "worked up," she was always cooperative with her. (Tr. 160.)

{¶ 50} Fourth, appellant argues that although the victim alleged that appellant stole her phone during the August 21, 2017 incident, when the officers arrived at her house, the victim was in possession of the phone. The victim testified, however, that when the police arrived at her apartment, she was holding appellant's phone — not her own phone. (Tr. 89.)

{¶ 51} CMHA Police Officer James Griffiths testified that he responded to the victim's apartment on August 21, 2017, and generated a report. Although the victim told officers that appellant stole her phone, he noted in his report that the victim was holding a phone when officers arrived. He confirmed that the victim was holding her phone. However, on redirect examination, Officer Griffiths acknowledged that he assumed the cell phone the victim was holding belonged to her. He did not ask or confirm whether the phone belonged to the victim, rather than appellant or a neighbor. (Tr. 135-136.)

{¶ 52} Finally, regarding appellant's argument that it was "typical" for the victim to call the police and/or for officers to be dispatched to her house, the victim acknowledged that she had trouble recalling specific details about the incidents due to the fact that there had been so many incidents involving appellant that resulted in her calling the police. Although appellant was charged for his involvement in 8 incidents, the victim opined that there had been as many as 26.

{¶ 53} As noted above, the trial court was in the best position to assess the credibility of witnesses, including the victim. The victim testified about her criminal history, both on direct and cross-examination. The victim also acknowledged that she wanted and even planned to get appellant arrested so she could return home and no longer have to move around with her children and stay in a hotel. Accordingly, the trial court had sufficient information to judge the victim's credibility and the credibility of each witness. Furthermore, the trial court "was free to believe all, part, or none of the testimony of each witness." *State v. Colvin*, 10th Dist. Franklin No. 04AP-421, 2005-Ohio-1448, ¶ 34; *State v. Smith*, 8th Dist. Cuyahoga No. 93593, 2010-Ohio-4006, ¶ 16.

{¶ 54} The trial court was in the best position to take note of the victim's inability to recall specific details (i.e., dates and times) of all the incidents, and any inconsistent statements she made regarding the incidents, and weigh this information in determining how much credibility to give her testimony.

> A factfinder may believe and convict a defendant based upon the testimony of a single eyewitness, including the victim. *See, e.g., State v. Martin*, 8th Dist. Cuyahoga No. 90722, 2008-Ohio-5263, ¶ 32-42 (rejecting argument that convictions were against the manifest weight of the evidence because the victim, who was the sole eyewitness to the events, gave conflicting information to police officers and there was no corroborating evidence, such as other witnesses or physical evidence); *see also State v. Payne*, 8th Dist. Cuyahoga No. 105965, 2018-Ohio-1399, ¶ 24, 29-30; *State v. Mansour*, 11th Dist. Trumbull No. 2011-T-0013, 2011-Ohio-5438, ¶ 17-29. Likewise, a defendant is not entitled to reversal on manifest weight grounds merely because a witness may have made inconsistent statements. *See, e.g., State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38, citing *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11.

*Robertson*, 8th Dist. Cuyahoga No. 106279, 2018-Ohio-2934, at ¶ 30.

{¶ 55} For all of the foregoing reasons, appellant's convictions are not against the manifest weight of the evidence. Appellant's second assignment of error is overruled.

### III. Conclusion

{¶ 56} After thoroughly reviewing the record, we affirm the trial court's judgment. Appellant's convictions for aggravated burglary, kidnapping, domestic violence, endangering children, menacing by stalking, and disrupting public services are not against the manifest weight of the evidence.

{¶ 57} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., JUDGE

PATRICIA ANN BLACKMON, P.J., and
EILEEN A. GALLAGHER, J., CONCUR